**In re Gary STEWART, Debtor.**

**Gary Stewart and Joyce Bradley Babin, Trustee, Plaintiffs,**

v.

**Barry County Livestock Auction, Inc. and Bill Younger, Defendants.**

**Bankruptcy No. 5:00–bk–80431. Adversary No. 5:01–ap–8030.**

United States Bankruptcy Court,
W.D. Arkansas,
Fayetteville Division.

Feb. 15, 2002.

John M. Blair, Rogers, AR, for debtor.

Joyce Bradley Babin, North Little Rock, AR, trustee.

J. Robin Pace, Bentonville, AR, for creditor.

## MEMORANDUM OPINION

ROBERT F. FUSSELL, Bankruptcy Judge.

Pending before the Court is the complaint of the debtor, Gary Stewart, and the chapter 13 trustee, Joyce Bradley Babin, against Barry County Livestock Auction, Inc. [Barry County Livestock Auction] and one of its owners, Bill Younger. In the complaint, the plaintiffs allege a preferential transfer pursuant to 11 U.S.C. § 547(b) relating to two cashier's checks in the total amount of $46,749.55, and a violation of the automatic stay pursuant to 11 U.S.C. § 362. The Court held a hearing on the complaint on December 13, 2001, at which time the Court held Count 2 of the complaint—violation of the automatic stay—in abeyance. At the conclusion of the hearing, the Court asked the parties to brief two issues relating to the treatment of an insufficient funds check in relation to the alleged affirmative defenses for the preference action. All briefing deadlines have been met by the parties. For the reasons stated in this opinion, the Court finds that the debtor made preferential transfers in favor of Barry County Livestock Auction pursuant to 11 U.S.C. § 547(b).

## PROCEDURAL HISTORY

The complaint was initially filed by the plaintiffs on April 5, 2001, to which the defendants filed a motion to dismiss. The Court entered its order denying the defendants' motion to dismiss on October 16, 2001, and the defendants filed an answer to the initial complaint on October 23, 2001. On November 2, 2001, the plaintiffs filed their first amended complaint, which the defendants answered on November 14, 2001. On December 4, 2001, the plaintiffs filed a motion to amend their complaint, which included a copy of the proposed second amended complaint. The defendants answered the proposed second amended complaint on December 7, 2001. Before beginning the hearing on the complaint on December 13, 2001, the Court granted the plaintiffs' motion to amend their complaint and accepted the answer of the defendants that had been filed December 7, 2001. The plaintiffs filed their second amended complaint on December 23, 2001, *nunc pro tunc* to December 13, 2001. During the hearing on December 13, 2001, the Court ordered the plaintiffs to amend their complaint to state with specificity facts relating to their allegation of a violation of the automatic stay. The plaintiffs filed their third amended complaint on January 4, 2002.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157, and it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F). The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## STIPULATED FACTS

The parties filed the following stipulations of fact with the Court on December 7, 2001:

1. This adversarial proceeding was filed on April 5, 2001. The Court has jurisdiction over the adversarial proceeding as a core proceeding and may enter a final order.

2. The Debtor, Gary Stewart, filed a chapter 13 bankruptcy case on April 11, 2000. Joyce Bradley Babin serves as Trustee for the Debtor's case.

3. At the time of the Debtor's bankruptcy filing, the Debtor had assets totaling $169,650.00 and liabilities totaling $316,785.12, as reflected on the Debtor's bankruptcy schedules. Of the $316,785.12 in liabilities, the Debtor scheduled $240,565.48 as secured debts and $76,219.64 as unsecured debts. [footnote omitted] The Debtor's assets and liabilities at the time of filing are consistent with the Debtor's assets and liabilities during the ninety day period prior to the Debtor's bankruptcy filing and reflect the Debtor's insolvency. No equity exists in any non-exempt property of the Debtor that can be liquidated for the benefit of the Debtor's unsecured creditors. If the Debtor had filed a chapter 7 case without considering the preference action, the case would be considered a no asset case and no distribution would be anticipated for unsecured creditors.

5.[sic] In the Debtor's plan, the Debtor has agreed to pay a monthly plan payment of $320.00 over an estimated 36 month plan term. The Debtor has "surrendered" and the Trustee has abandoned the real and personal property securing the Debtor's secured claims. Based on the plan payment and term, unsecured creditors will not be paid in full and are anticipated to receive a minimal (approximately one to two percent), if any, distribution from the Debtor's plan.

6. Barry County Livestock Auction, Inc. ("Barry County"), a Missouri corporation, operates a livestock auction facility located in Exeter, Missouri. Barry County is listed as an unsecured creditor in the Debtor's case. Barry County has not filed a claim in the Debtor's case. Bill Younger is an officer and shareholder of Barry County. The Barry County invoices reflect that Bill Younger, also known as William J. Younger, Jr., is "owner" of "Barry County Livestock Auction."

7. Beginning in July 1997, the Debtor engaged in a business relationship with Barry County and Bill Younger that continued until the time of the Debtor's bankruptcy filing. While the Debtor occasionally sold cattle at Barry County, the Debtor primarily purchased cattle from Barry County. Pursuant to the terms of the invoices reflecting the purchases, the Debtor was required to pay for cattle purchased the same day of the purchases.

8. Within 90 days of the Debtor's bankruptcy filing, the Debtor purchased cattle from Barry County. These purchases, along with the payment disposition for each purchase, are reflected on Exhibit 15.

9. Two transactions between the Debtor and Barry County resulted in a total payments of $46,749.55 by cashier's checks and are the subject of the Trustee's preference action.

10. On January 29, 2000, the Debtor purchased cattle from Barry County by personal check number 4029 from the Bank of Pea Ridge, Arkansas, in the amount of $17,580.70. Check No. 4029 was issued to pay Barry County Invoice Nos. 15, 16 and 17, also dated January 29, 2000. When Check No. 4029 was returned to Barry County for insufficient funds on February 12, 2000, the

Debtor tendered a cashier's check numbered 83582 drawn on the Bank of Pea Ridge in the amount of $17,580.70 on February 12, 2000, to satisfy the obligation owing from the insufficient Check No. 4029.

11. On February 19, 2000, the Debtor purchased cattle from Barry County by personal check number 4049 from the Bank of Pea Ridge, Arkansas, in the amount of $29,165.85. Check No. 4049 was issued to pay Barry County Invoice Nos. 21, 22 and 23, also dated February 19, 2000. When Check No. 4049 was returned to the [sic] Barry County for insufficient funds on March 4, 2000, the Debtor tendered a cashier's check numbered 83692 drawn on the Bank of Pea Ridge in the amount of $29168.85 on March 4, 2000, to satisfy the obligation owing from the insufficient Check No. 4029.

12. Cashier's Check Nos. 83582 and 83692 were purchased with monies belonging to the Debtor and constituted property of the Debtor.

13. The payments made with Cashier's Check Nos. 83582 and 83692 were made while the Debtor was presumed insolvent and was insolvent.

14. The payments made with Cashier's Check Nos. 83582 and 83692 were made within 90 days immediately preceding the Debtor's bankruptcy filing.

15. The payments made with Cashier's Check Nos. 83582 and 83692 enabled Barry County to receive more than it would have received if this case had been a chapter 7 case; if the payments had not been made; and if Barry County had received payment of its debt as allowed under the Bankruptcy Code.

16. Barry County and Bill Younger received notice of the Debtor's bankruptcy filing as a result of the Notice of Commencement of Case sent on April 14, 2000. The first meeting of creditors for the Debtor's case was conducted and concluded on June 6, 2000. Bill Younger, Dayne Galyen and Dayne Galyen, Jr., all representatives and officers of Barry County, attended and participated in the first meeting of creditors.

17. On or about the evening of June 6 or 7, 2000, Bill Younger, Dayne Galyen and Dayne Galyen, Jr., acting individually and on behalf of Barry County, went to the Debtor's residence. The parties' recollection of the events differ; however, a disagreement occurred and the Benton County Sheriff's Department was contacted and subsequently appeared on the scene. A few days later, Debtor's mother, Janet Scott, paid $15,000 to Barry County toward the Debtor's debt owing Barry County. Bill Younger then returned an insufficient check that had been received from the Debtor prior to the bankruptcy filing to the Debtor's mother.

The stipulations of fact were entered into evidence as Exhibit 18.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
### COUNT 1—PREFERENCE

██ Under § 547 of the bankruptcy code, an avoidable preference is a transfer of the debtor's property to or for the benefit of a creditor, on account of an antecedent debt owed by the debtor before the transfer was made, on or within 90 days before the date of the filing of the debtor's petition, while the debtor was insolvent, that enabled the creditor to receive more than the creditor would in a chapter 7 liquidation. 11 U.S.C. § 547(b). The burden of proof is on the trustee to prove the preferential transfer. *Bergquist v. Anderson Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 56 B.R. 339, 370 (Bankr.D.Minn.1985). In this case,

the parties have stipulated that cashier's check number 83582 and cashier's check number 83692, in the total amount of $46,749.55, and which are the subject of the trustee's preference action, were purchased with money belonging to the debtor and constituted property of the debtor. They further stipulated that the purchases were made while the debtor was insolvent; within 90 days immediately preceding the debtor's bankruptcy filing; and enabled Barry County Livestock Auction to receive more than it would have received if this case had been a chapter 7 case, if the payments had not been made, and if Barry County Livestock Auction had received payment of its debt as allowed under the bankruptcy code.

A creditor is defined as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A). A claim is defined as a "right to payment." *Id.* § 101(5)(A). At the trial, the debtor testified that he gave the cashier's checks to Barry County Livestock Auction because he "owed it to them." The testimony and evidence was undisputed that cashier's check number 83582 was given by the debtor to Barry County Livestock Auction on February 12, 2000, to replace the debtor's personal check number 4029, which was delivered to Barry County Livestock Auction on January 29, 2000, and subsequently dishonored by the bank. The testimony and evidence was also undisputed that cashier's check number 83692 was given by the debtor to Barry County Livestock Auction on March 4, 2000, to replace the debtor's personal check number 4049, which was delivered to Barry County Livestock Auction on February 19, 2000, and subsequently dishonored by the bank.

A debt is antecedent if the debt was incurred prior to the allegedly prefer-

ential transfer. *Jones Truck Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund (In re Jones Truck Lines, Inc.)*, 130 F.3d 323, 329 (8th Cir. 1997). A debt is incurred " 'on the date upon which the debtor first becomes legally bound to pay.' " *Id.* (quoting *In re Iowa Premium Serv. Co.*, 695 F.2d 1109, 1111 (8th Cir.1982)). In this case, Dayne Galyen Jr. testified, and the Court credits his testimony, that all buyers at the auction barn were required to pay for their purchases on the date of the sale. Therefore, the debts were incurred two weeks before the delivery of the cashier's checks and were antecedent debts.

The Court finds that Barry County Livestock Auction is a creditor for purposes of 11 U.S.C. § 547(b)(1), and that cashier's checks number 83582 and 83692 were given by the debtor to Barry County Livestock Auction for antecedent debts. Because the parties have stipulated to the other elements of a preferential transfer, the Court finds that the trustee has met her burden of proof as to the preferential transfer of the two cashier's checks. The creditor may avoid preference liability if it can prove that it falls within one of the exceptions set forth in § 547(c). The two exceptions that the creditor has raised, and that are at issue in this case, are the contemporaneous exchange for new value exception in § 547(c)(1), and the ordinary course of business exception in § 547(c)(2).

**CONTEMPORANEOUS EXCHANGE FOR NEW VALUE EXCEPTION**

To qualify for the contemporaneous exchange for new value exception under § 547(c)(1), a creditor must prove that an otherwise preferential transfer was "(A) intended by the debtor and the creditor . . . to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange." 11 U.S.C. § 547(c)(1). "New

value" is defined as "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation." 11 U.S.C. § 547(a)(2).

Before the Court can determine whether the payments made by the debtor with cashier's checks payable to Barry County Livestock Auction were contemporaneous exchanges for new value under the bankruptcy code, the Court must determine as a matter of law when the transfer of cattle occurred. If the transfer of the cattle did not occur until the cashier's checks were presented to Barry County Livestock Auction, the transactions may have been contemporaneous exchanges for new value. If, on the other hand, the transfer of the cattle occurred on the day of the sale, two weeks before the debtor presented the cashier's checks to Barry County Livestock Auction, the Court must determine whether the subsequent delivery of the cashier's checks to replace the insufficient funds checks constituted contemporaneous exchanges for new value.

■ The sale of cattle is controlled by the Uniform Commercial Code [UCC], which sets forth in Article 2 when the transfer of title occurred. Under the UCC, as adopted by Missouri in 1965, goods are defined as "all things . . . which are moveable at the time of identification to the contract for sale. . . ." Mo.Rev.Stat. § 400.2–105(1) (2001).[1] " 'Goods' also includes the unborn young of animals. . . ." Id. Therefore, the Court concludes that livestock, and specifically cattle, are

"goods" within the definition found in the UCC and are covered under the law governing the sale of goods in commercial transactions. Accord J.R. Vince v. J.D. Broome, 443 So.2d 23, 26 (Miss.1983); see also Central Prod. Credit Ass'n v. Hopkins, 810 S.W.2d 108, 114 (Mo.Ct.App. 1991) (referring to cattle as goods for purposes of Mo.Rev.Stat. § 400.2–201). Before an interest in goods can pass to another, the goods must be "both existing and identified." Mo.Rev.Stat. § 400.2–105(2) (2001). In this case, the bill of sales relating to the insufficient fund checks identify specifically the cattle sold by description and number. Under the UCC, a sale "consists in the passing of title from the seller to the buyer for a price." Id. § 400.2–106(1). The debtor was a buyer—a "person who buys or contracts to buy goods"— and Barry County Livestock Auction was a seller—"a person who sells or contracts to sell goods." Id. § 400.2–103(1).

■ In this case, Barry County Livestock Auction printed on the face of each bill of sale language dealing with the transfer of title:

ALL SALES ARE MADE, AND TITLE IS TRANSFERRED, SUBJECT TO FINAL PAYMENT IN CASH OR SOLVENT CREDIT. IF ANY CHECK, DRAFT, OR OTHER INSTRUMENT TENDERED IN PAYMENT IS NOT PAID PROMPTLY ON PRESENTATION, THIS BILL OF SALE DOES NOT TRANSFER TITLE AND SHALL BE NULL AND VOID, AND OF NO EFFECT.

The first sentence states that the sale is voidable—all sales are made *subject to* final payment. Based on this sentence, the transfer occurred on the date of the sale.

---

**1.** The parties stipulated that Barry County Livestock Auction is a Missouri corporation that operates an auction facility in Exeter, Missouri. There is no factual dispute that the sale of cattle took place in the state of Missouri, and that Missouri law is applicable.

The second sentence states that the sale is void if a check is not paid upon presentment. Based on this sentence, it appears that Barry County Livestock Auction was attempting to retain title to the cattle in the event the debtor's personal checks were not honored. According to the UCC, any attempt to retain title to the cattle pending the debtor's personal checks being honored by the bank is ineffective. Section 400.2–401(1) states, in part, that "[a]ny retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer *is limited in effect to a reservation of a security interest.*" *Id.* § 400.2–401(1) (emphasis added). The next subsection of the UCC states the time at which title to the goods pass to the buyer: "Unless otherwise explicitly agreed *title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest....*" *Id.* § 400.2–401(2) (emphasis added). The relationship between subsections (1) and (2) was discussed in *Matter of Bosson*, 432 F.Supp. 1013 (D.Conn.1977):

> Although § 2–401(2) begins with the phrase '[u]nless otherwise explicitly agreed,' the prior subsection places limits on the parties contractual freedom. Specifically, § 2–401(1) negates any attempt to forestall passage of title beyond the moment of final delivery; contract language purporting to do so merely results in a security interest being retained. Similarly, § 2–401(1) prohibits the passage of title prior to the identification of the goods in question to the contract. In between these extremes, however, the parties may by contract specify the point at which title passes.

*Id.* at 1020 n. 24. According to a bankruptcy court in New York, the "unless" clauses that preface subsections (2) and (3) of section 2–401 demonstrate the drafters' intent that the subsections are "default" rules that apply in the absence of a contrary agreement. *In re J. Adrian Sons, Inc.*, 205 B.R. 24, 27 (Bankr.W.D.N.Y. 1997). However, any contrary agreement cannot conflict with 2–401(1). *Id.* Under subsection (1), by agreement of the parties, title to goods can pass from the time the goods are identified in the contract up to the time the goods are delivered. Subsection (2) deals with fact patterns in the absence of an agreement to the contrary pursuant to subsection (1). *Id.* The Court finds that under the UCC, title to the cattle passed upon delivery of the cattle on the day of the respective sales. At best, Barry County Livestock Auction retained only a security interest in the cattle.[2]

**2.** The Court did find one case in which the Supreme Court of Nebraska found that an explicit agreement to prevent passage of title beyond the time of delivery was allowed. *Bowman v. American Home Assurance Co.*, 190 Neb. 810, 213 N.W.2d 446 (1973). In that case, the court stated that title could pass to the buyer "(1) at the time and place where the seller completes his performance with reference to the physical delivery of the goods or (2) at any other time explicitly agree to by the parties." *Id.* at 448 (citing 2–401 of the UCC). The court found that there was substantial evidence from which a jury could have inferred either that the seller had not completed physical delivery of the subject airplane, or that the buyer and seller had an explicit agreement that title would not pass until completion of all necessary paperwork. *Id.* at 448–49. To find an explicit agreement, the court said that the terms needed to be "so clearly stated or distinctly set forth that there is no doubt as to its meaning." *Id.* at 449. In the case before this Court, neither party discussed these provisions of the UCC, and neither party testified that the attempted reservation of title by the seller was an explicit term of the contract for sale. Further, the language contained at the bottom of the bill of sale appears to be ambiguous as to the passing of title. On the one hand, the seller states

Having found that the transfer of cattle occurred on the date of the sale, the Court must now determine whether the delivery of the cashier's checks two weeks after the transfer of the cattle is a contemporaneous exchange for purposes of § 547(c)(1). The legislative history of § 547(c)(1) specifically references transactions in which checks are involved:

> Normally, a check is a credit transaction. However, for the purposes of this paragraph, a transfer involving a check is considered to be "intended to be contemporaneous," and if the check is presented for payment in the normal course of affairs, which the Uniform Commercial Code specifies as 30 days, U.S.C. § 3–503(882)(a), that will amount to a transfer that is "in fact substantially contemporaneous."

*Goger v. Cudahy Foods Co. (In re Standard Food Serv., Inc.)*, 723 F.2d 820, 821 (11th Cir.1984) (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 88, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5874); *accord Walsh v. Smythe Buick Isuzu (In re Gaildeen Indus., Inc.)*, 71 B.R. 759, 763 (9th Cir. BAP 1987). The debtor's payment by personal check constituted a contemporaneous transfer only if the check was presented and paid within a reasonable time. *Hall Mark Electronics Corp. v. Sims (In re Lee)*, 179 B.R. 149, 163 (9th Cir. BAP 1995). Had the debtor's personal checks cleared, Barry County Livestock Auction's argument that a contemporaneous exchange for value occurred would prevail.

However, other portions of the legislative history indicate that the bank's dishonor of the personal checks changed the nature of the transaction:

Contrary to language contained in the House report, payment of a debt by means of a check is equivalent to a cash payment *unless the check is dishonored.* Payment is considered to be made when the check is delivered for purposes of sections 547(c)(1) and (2).

*Standard Food Serv., Inc.*, 723 F.2d at 821 (quoting 124 Cong. Rec. H11,097 (daily ed. Sept. 28, 1978); 124 Cong. Rec. S17,414 (daily ed. Oct. 6, 1978)). A contemporaneous exchange defense cannot involve a dishonored check. *Lee*, 179 B.R. at 163. When the checks were dishonored by the bank, the transactions became credit transactions and created an antecedent debt. *Id.; Standard Food Serv., Inc.*, 723 F.2d at 821. Any subsequent payment, no matter how quickly made, would satisfy that antecedent debt. *Lee*, 179 B.R. at 163 (quoting *In re Barefoot*, 952 F.2d 795, 800 (4th Cir.1991)). When the debtor delivered the cashier's checks to Barry County Livestock Auction, the cashier's checks satisfied the antecedent debt, and were not contemporaneous exchanges for new value. Hence, Barry County Livestock Auction's contemporaneous exchange for new value exception fails.

### ORDINARY COURSE OF BUSINESS EXCEPTION

Barry County Livestock Auction also raised the ordinary course of business exception pursuant to § 547(c)(2). To qualify for the ordinary course of business exception, a creditor must prove that the transfer was "(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of

---

that the sale is voidable in that "all sales are made *subject to* final payment in cash or solvent credit." On the other hand, the seller states that the contract is void "if any check, draft, or other instrument tendered in payment is not paid promptly on presentation."

Even if the Nebraska court is correct in its determination that 2–401 allows the parties to agree explicitly to the passing of title after the delivery of goods, such an explicit agreement is not present in this case.

the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and (C) made according to ordinary business terms." 11 U.S.C. § 547(c)(2).

■ The parties did not specifically stipulate that the transfers were in payment of a debt incurred by the debtor in the ordinary course of business between the debtor and Barry County Livestock Auction. However, the parties did stipulate that the debtor engaged in a business relationship with Barry County Livestock Auction in July 1997 that continued until the debtor filed his chapter 7 bankruptcy petition on April 11, 2000. They also stipulated that in the course of their business relationship, the debtor purchased cattle from Barry County Livestock Auction and was required to pay for the cattle purchased the same day of the purchases. Because the payments were made to satisfy debts that the debtor incurred in the ordinary course of his business dealings with Barry County Livestock Auction, the Court finds that Barry County Livestock Auction meets the elements of subsection (c)(2)(A).

■ Subsection (c)(2)(B) deals with the way the parties actually conducted their business dealings. According to the Eighth Circuit Court of Appeals, a court must engage in a "peculiarly factual analysis" to determine whether payments made by the debtor during the 90 day preference period were made in the ordinary course of business. *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir.1991). Specifically, the court must look at the "consistency of the transaction in question as compared to other, prior transactions between the parties." *Concast Canada, Inc. v. Laclede Steel Co.* (*In re Laclede Steel Co.*), 271 B.R. 127, 131 (8th Cir. BAP 2002) (citing *Lovett*, 931 F.2d at 497). Sufficient alteration of any

one of four factors may be sufficient for a court to conclude that a payment was made outside the ordinary course of business. *Id.* at 132. The factors are,

(1) the length of time the parties were engaged in the transactions at issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or the creditor engaged in any unusual collection or payment activity; and (4) whether the creditor took advantage of the debtor's deteriorating financial condition.

*Id.* n. 3. The Eighth Circuit has found that the timing of the payments to the creditor to be of overriding importance, and stated that review of the 12 months preceding the 90 day preference period and the 90 day period itself was an appropriate standard for determining the ordinary course of business. *Lovett*, 931 F.2d at 498.

■ The Court will first look at all of the dealings the debtor had with Barry County Livestock Auction. The Court received into evidence as Exhibit 8, a "Summary of Invoices/Payments From July 19, 1997—January 8, 2000"; and as Exhibit 15, a "Schedule of Invoices/Payments January 15, 2000—March 4, 2000." The debtor made his first purchase from Barry County Livestock Auction on July 19, 1997. Between July 19, 1997, and January 11, 1999, the debtor made a total of 47 purchases of various lots of cattle. He paid for each purchase with a personal check, and all of those checks were honored by the bank when presented for payment. Between January 11, 1999, and January 10, 2000, the 12 months preceding the 90 day preference period, the debtor made a total of 41 purchases of various lots of cattle from Barry County Livestock Auction. All of those purchases were also initially made with a personal check, and all but one of those checks were honored by the bank when presented. The one

check that was not honored by the bank was written on December 18, 1999. The debtor presented a cashier's check to Barry County Livestock Auction on January 8, 2000, to pay that debt. Finally, between January 11, 2000, and April 11, 2000, the 90 day preference period, the debtor made a total of seven purchases from Barry County Livestock Auction. All of those purchases were initially made with a personal check. Four of the seven checks were not honored by the bank when presented for payment. The debtor presented cashier's checks to pay for two of those debts, which are the subject of the trustee's preference action.

The debtor only presented one check during the 12 month period preceding the 90 day preference period that was dishonored by the bank when presented for payment. In fact, that was the only check that was not honored when presented to the bank during the entire 42 months the debtor had been purchasing cattle from Barry County Livestock Auction prior to the preference period. That one check was written within three weeks of the preference period, and the debt was paid three days before the preference period. On the other hand, the debtor presented four checks during the preference period that were dishonored by the bank when presented for payment, two of which were later paid by cashier's checks. Despite the one dishonored check right before the preference period, the Court finds that the ordinary course of business between the debtor and Barry County Livestock Auction was that the debtor paid for his purchases with a personal check on the date of sale that was honored when presented for payment. The payments by personal checks made during the preference period that were dishonored by the bank when presented for payment, but later paid with cashier's checks, were not sufficiently consistent with the payments made during the

prior 12 months. Because of this, the Court finds that Barry County Livestock Auction has failed to meet the elements of subsection (c)(2)(B).

■■■ Subsection (c)(2)(C) requires that the transfers be made according to ordinary business terms; in other words, "whether the transaction was ordinary pursuant to terms in the industry." *Laclede Steel Co.*, 271 B.R. at 133. To make this determination, the Court must compare the payment record of the debtor with the general practice in the industry regarding time of payment. *Lovett*, 931 F.2d at 499. The only testimony presented regarding the general practice in the industry was from Dayne Galyen Jr. He testified that cattle purchases were always paid on the day of purchase and that this practice was typical in the industry. Upon cross examination, he again stated that "by law," a buyer is required to pay on the day of the sale. Based on Mr. Galyen's testimony, which the Court credits, and in the absence of any contrary evidence, it is clear that payment by cashier's check two weeks after the date of sale is not typical in the industry. Because of this, the Court finds that Barry County Livestock Auction has failed to meet the elements of subsection (c)(2)(C).

Based on the above findings of facts and conclusions of law, the Court finds that the payments made by the debtor to Barry County Livestock Auction with cashier's check number 83582 and cashier's check number 83692, in the total amount of $46,749.55, were preferential transfers in favor of Barry County Livestock Auction. By separate order, the Court will enter its judgment in favor of the chapter 13 trustee and against the defendant, Barry County Livestock Auction, in the amount of $46,749.55.

## COUNT 2—VIOLATION OF AUTOMATIC STAY

At the hearing on December 13, 2001, the Court held Count 2 of the plaintiffs' complaint in abeyance and ordered the debtor to amend Count 2 to state with specificity facts relating to his allegation of a violation of the automatic stay pursuant to §§ 362(a)(6) and 362(h). The debtor complied with the Court's order and filed his third amended complaint on January 4, 2002. By separate order, the Court has set a hearing on Count 2 of the plaintiffs' complaint on March 1, 2002, at 9:00 a.m. in the United States Bankruptcy Court, Fayetteville, Arkansas.